UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

In re:

Jacalyn S. Nosek
                    Debtor

Chapter 13
Case No.: 02-46025-JBR

Jacalyn S. Nosek
                    Plaintiff
v.
Ameriquest Mortgage Company
                    Defendant

Adversary Proceeding No.  04-04517

**Memorandum in Support of Debtor's Motion for Partial Summary Judgment, or in the alternate for Judgment on the Pleadings, on the Issue of Liability Only**

INTRODUCTION

The Debtor, Jacalyn S. Nosek, filed an Adversary Complaint alleging in relevant part that the Defendant Ameriquest Mortgage Company (hereinafter "Ameriquest") failed to keep accurate accounting records, and that the Defendant failed to differentiate between pre-petition mortgage arrears owed by the Debtor, which are paid through the Debtor's Chapter 13 Plan as administered by the Standing Chapter 13 Trustee, and post-petition payments, which are tendered directly by the Debtor to the mortgage servicer or its attorney.

The filing of the Adversary Complaint in this case was preceded by two prior bankruptcy cases, prompted by Ameriquest's scheduled foreclosure sales.  In both of those cases Debtor, through prior counsel, attempted unsuccessfully to resolve the ongoing accounting dispute with Ameriquest.

In the current chapter 13 case Debtor, through counsel, first attempted to obtain an accurate accounting by filing her *Debtor's Motion to Determine Amount of Liens*.  Despite several hearings, and Orders from this Court, the information provided by Ameriquest was inadequate. The Adversary Complaint was filed on December 2, 2004.

Debtor utilized, through the adversary proceeding, the full range of discovery options, including interrogatories, requests for admission, and finally a deposition accompanied by a request to produce documents. After the deposition was suspended, the Defendant supplemented its document response.

The discovery responses by Ameriquest unequivocally confirm that Ameriquest does not have accounting systems in place to separately track pre- and post-petition payments due, that payments made by the Debtor are placed in a suspense account, and that Amerquest's computerized accounting systems do not show a running balance in the suspense account. In "servicing" this Debtor's account, Ameriquest applied payments received from the Debtor, intended to be applied to post-petition obligations, to pre-petition arrears.  Further, Ameriquest failed to segregate payments received from the Chapter 13 trustee for application against pre-petition arrears.

These systemic accounting inaccuracies manifest themselves in different ways: the payoff amounts provided when Debtor attempted to refinance were incorrect; or here, where the Debtor has a variable rate mortgage loan, by carrying an incorrect amount as the amount of the monthly payment due.

By failing to recognize the essence of chapter 13 - not differentiating between pre-petition and post-petition payment obligations -  Ameriquest's accounting systems apply all payments received, whether from the debtor or the Standing Chapter 13 Trustee, against what Ameriquest refers to as the "contractually-due" payment, or the oldest monthly payment owed.

## STATEMENT OF MATERIAL FACTS WHICH DEBTOR CONTENDS THERE IS NO GENUINE ISSUE TO BE TRIED

1.      On October 22, 2002, the Debtor filed a petition under Chapter 13 of the United States

Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts.

2.      Debtor's bankruptcy filing was prompted by an imminent mortgage foreclosure sale by

Ameriquest.

3.      Ameriquest is the holder of a first position mortgage on the Property in the original amount of

$90,000.00, given by Nosek to Ameriquest on or about November 25, 1997.  A copy of the

Mortgage is attached as Exhibit 1.

4.      Ameriquest filed, after discussion and document exchanges with Debtor's counsel, an amended

Proof of Claim, Exhibit 2 on April 22, 2003, which credits the Debtor with all payments she

made during the pendency of her two prior bankruptcy cases.

5.      The terms of the Debtor's loan agreement with Ameriquest provide for semi-annual interest rate

adjustments.

6.      Copies of letters from Ameriquest setting forth the changes in monthly payments, and their

effective dates - January and July of each calendar year - are attached here as Exhibit 3.

7.      A summary of the Adjustable Loan Notifications over the entire life of Debtor's loan with

Ameriquest is attached here as Exhibit 4.

8.      In March, 2004, the Debtor directly contacted the law firm of Ablitt & Caruolo, PC, and

requested that a payment history be sent to her.

9.      Ablitt & Caruolo, PC, is local counsel for Ameriquest Mortgage Company. Ablitt & Caruolo

had initiated pre-bankruptcy foreclosure proceedings against the Debtor, and represents

Ameriquest Mortgage Company in this bankruptcy case.

10.    On May 10, 2004, Mr. Michael Guarino an employee of Ablitt & Caruolo, PC, faxed a 12

month payment history ("the Payment History"), attached as Exhibit 5, to Debtor's counsel.

11.    Debtor has alleged that the May 10, 2004, Payment History fails to reflect all payments made

by the Debtor from January through May, 2004; and incorrectly states the amounts due from

the Debtor pursuant to the terms of the Variable rate Note.

12.    On July 23, 2004, Debtor, by and through her counsel, sent a letter to local counsel for

Ameriquest, Brian Hachey, Esq. of the law firm of Ablitt & Caruolo, PC, attached here as

Exhibit 6. In part, the letter stated:

> This is a written demand for relief pursuant to Massachusetts General Laws
> Chapter 93A, Sections 2, 9 and 11 for payment of damages suffered by Ms. Nosek
> as a consequence of Ameriquest's unfair and/or deceptive acts or practices. It is also a
> *Qualified Written Request* under the Real Estate Settlement Procedures Act, 12 USC
> §2605(e).
>
> Please review the enclosed documents with your client, and get back to me
> with a proposal that addresses the [sic] both the accounting discrepancies, and as well
> as a means to make Ms. Nosek whole for the financial damages she has incurred as a
> result of Ameriquest's improper handling of her account, and the professional fees
> incurred by her.

13.    Ameriquest failed to tender an offer of settlement within the Massachusetts General Laws

Chapter 93A, 30-day statutory period.

14.    On or about September 10, 2004, Ameriquest generated another payoff statement, which was

provided to Debtor's counsel via fax on September 21, 2004, attached here as Exhibit 7.

15.    Debtor has alleged that the September 10, 2004, payoff statement contains numerous material

inaccuracies, including, but not limited to:

     a.      incorrect interest rates,

     b.      incorrect foreclosure fees and

     c.      incorrect legal fees.

16.     Under the terms of the Stipulation resolving a motion for relief brought in February, 2003, by Ameriquest, the attorneys fees were included in the Stipulation amount, and were paid by the Debtor.

17.     The satisfaction of the payment obligations set forth in the Stipulation is evidenced by the *Motion to Withdraw the Affidavit of Non-Compliance*, signed by attorney Jennifer Haskell of Ablitt & Caruolo, PC, and filed with this Court on December 10, 2003, attached as Exhibit 8,

18.     The September 10, 2004, payoff statement further claims that $874.10 is owed in late charges, including approximately $390.00 in late charges (an additional approximately 15 months) that have allegedly accrued during the pendency of this case.

19.     The payoff letter further states that $3,929.78 was being held in a suspense account, an amount equal to more than five monthly payments.

20.     On September 7, 2004, the United States Bankruptcy Court, J.  Rosenthal, J., ORDERED that Ameriquest file a memo within 15 days "explaining the basis in their documents and/or in law for their use of so-called "suspense accounts".

21.     Ameriquest failed to comply with the Court's September 7, 2004 Order.

22.     On or about September 23, 2004, Ameriquest filed with the Court two documents: "Payment Applications During Bankruptcy", and "Payment History & Reconciliation".

23.     Filed herewith is the *Affidavit of Jacalyn S. Nosek in Support of Debtor's Motion for*

*Partial Summary Judgment, or in the alternate for Judgment on the Pleadings, on the Issue of Liability Only*, see section I - H for a discussion of the various payoff letters issued.

24.   On October 5, 2004, the United States Bankruptcy Court, J. Rosenthal, J., ORDERED that Ameriquest comply with the Court's Order of 9/7/04 no later than 10/21/04.

25.   Ameriquest failed to comply with the Court's Order of October 5, 2004.

26.   On November 2, 2004, the United States Bankruptcy Court, J. Rosenthal, J., issued an Order which stated that:

AMERIQUEST IS HEREBY SANCTIONED $500.00 FOR FAILURE TO COMPLY WITH THIS COURT'S ORDERS OF 9/7/04 AND 10/5/04 "CONCERNING THE FILING OF A MEMO WITHIN 15 DAYS EXPLAINING THE BASIS IN THEIR DOCUMENTS AND/OR IN LAW FOR THE USE OF SO CALLED "SUSPENSE ACCOUNTS"." IF SAID MEMO IS NOT FILED WITHIN 7 DAYS, THE COURT WILL CONSIDER FURTHER SANCTIONS. DEBTOR SHALL FILE AN ADVERSARY PROCEEDING AGAINST AMERIQUEST CONCERNING THE AMOUNT OF ITS LIENS AND AMERIQUEST'S APPARENT INABILITY TO PROVIDE AN ACCURATE ACCOUNTING.

27.   In April, 2005, after the filing of a motion by Debtor's counsel, the $500.00 was finally received.

28.   On February 17, 2005, Debtor's counsel noticed the taking of the Deposition of Ben Vittali, the Bankruptcy Manager for Ameriquest Mortgage Company. A copy of the Deposition Notice is attached here as Exhibit 9.

29.   Mr. Vittali had signed an affidavit in his capacity as Bankruptcy Manager for Ameriquest Mortgage Company that was filed with this Court.

30.   Debtor's counsel was subsequently informed that Mr. Vittali had left the employ of Ameriquest

Mortgage Company.

31.    On May 4, 2005, Debtor's counsel took the deposition of Judi R. Johnston, an employee

designated by Ameriquest Mortgage Company as having the most knowledge and familiarity

with this account.

32.    A copy of the Transcript of Judi Johnston's Deposition is attached here as Exhibit 10.

33.    The Exhibits to the Deposition are attached here as Exhibit 11, with an index prepared by

Debtor's counsel.

34.    The Deposition was suspended so that Ameriquest could supplement its response to the

Debtor's document requests.

35.    Documents produced *after* the deposition by Ameriquest relevant to this motion include the

following:

a.    "P 309 History Transactions", a description of the numerical transaction codes which

appear on the screen printouts, attached as Exhibit 12.

b.    "Mortgage Loan History", attached as Exhibit 13. [NB: The printout is in two parts, a 2

page printout in reverse chronological order (most recent activity first) with the date 04-

22-05 appearing in the uppermost right corner covering the period from April 18, 2005

to November 24, 2004 and a 34 page printout with the date 12-04-04 appearing in the

uppermost right corner for the period December 3, 2004 to December 11, 2001.

There is a slight overlap where activity on 11-24 and 12-03 appear on both printouts.]

c.    "Mortgage Loan History Screen 5", attached as Exhibit 14. [NB: The printout is in two

parts, a 2 page printout in reverse chronological order with the date 04-22-05

appearing in the uppermost right corner covering the period from April 18, 2005 to

November 24, 2004 and a 34 page printout with the date 12-06-04 appearing in the

uppermost right corner for the period December 3, 2004 to December 11, 2001.

d.    Lenstar Notes, attached as Exhibit 15. [NB: The Lenstar printout is in two parts, a 38

page printout in reverse chronological order covering the period from May 24, 2005 to February 21, 2003, and a 6 page printout for the period February 21, 2003 to October 11, 2002.]

e.    "Loan History Y-T-D", attached as Exhibit 16, consisting of twelve pages of printouts covering the calendar years 1997 through 2001.

f.    AMC Mortgage Services Bankruptcy Department's *Procedure Manual*, attached as Exhibit 17, containing a print date of 5/24/2005 in the lower right corner.

g.    An undated  "Fees Checklist" cover page with eight pages of printouts dated 03/04/02, attached as Exhibit 18.

36.    As of this date, Ameriquest has not produced its paper file concerning Ms. Nosek's loan.

37.    The "Loan History Y-T-D" screens use a different computer program where the transaction codes are alphabetic, rather than numeric. The Transaction Codes appear on the first page of Exhibit 16, where "L" = Paid Thru Date. The last page of this Exhibit indicates that Ms. Nosek was paid through 12-11-01 as of the end of calendar year 2001.

38.    Ms. Nosek filed her current chapter 13 case on October 22, 2002.

39.    Ameriquest's "Mortgage Loan History", attached as Exhibit 13, provides evidence of the mis-application of post-petition payments made by Ms. Nosek to pre-petition arrears.

40.    Directing the Court's attention to Page 002 of 034 of Exhibit 13, the screen printout may be read as follows:

a.    The header which appears across the top of every page states that the Debtor is contractually due for 06-01-03.

b.    The third line states that the interest rate is 9.5%.

c.    The fourth line states that the net monthly payment due is $759.67,

d.    The line captioned in the far left margin "APP" is the date the transaction is applied,

where 10-15 is MM-DD and the year is omitted, in this case it is 2004.

    e.      The line captioned "DUE" in the far left is the date the transaction is applied where 05-

03 is MM-YR.

    f.      The printout indicates that on 10-15 (2004) a payment (TYPE/TRAN 1 73 is an

"Irregular Payment") was received in the AMOUNT of $725.22 and $34.45 was

taken from a SUSPense account, so that $725.22 plus $34.45 equals $759.67, the

amount due for the May, 2003 payment.

    g.      The next column to the left with the "APP" date of 10-18 (2004) indicates that the

DUE date has advanced to 06-03 (June, 2003).

41.    The accounting errors by Ameriquest in this case begin with the first post-petition payment due.

On November 1, 2002, Debtor's counsel forwarded debtor's check number 146 in the amount

of $820.96 to "Darlene" at the law firm of Buchalter, Nemer, Fields & Younger.  (See Exhibit

11, Deposition Exhibit 10).

42.    Page 025 of 034 of Exhibit 13 indicates that on 11-14 (2002) that payment was posted, and

applied to SUSP. -

43.    In its pleadings, Ameriquest has denied receiving the check. In its answers to Interrogatories,

Ameriquest responded as follows:

6. With respect to your answer to paragraph 6 of Plaintiff's Complaint, state in
complete and full detail all facts upon which you rely in denying the allegations set forth
in paragraph 6 of Plaintiff's Complaint.
*Upon the filing of the bankruptcy petition, the first post-petition payment due was
tendered directly by debtor's counsel on November 1, 2002 to: ATTN: Darlene,
Buchalter, Nemer, Fields & Younger, 895 Dove Street, Ste. 400, P.O. Box 8129,
Newport Beach, CA  92660.*

**RESPONSE:** The Defendant calls on Plaintiff to prove same.

44.    Similarly, in its responses to Requests for Admissions,  Ameriquest responded as follows:

I.. That each of the following statements is true:

1.    On or about November 1, 2002, the first post-petition payment due was
       tendered directly by debtor's counsel to: ATTN: Darlene, Buchalter, Nemer,
       Fields & Younger, 895 Dove Street, Ste. 400, P.O. Box 8129, Newport
       Beach, CA  92660.
       Response: Denied

45.    The Lenstar notes for 11/82002 contain an e-mail from Darlene Long-Shorts to John Teston

       stating that: "Check #146 for $820.96 to Lisa".

46.    The December, 2002 payment tendered by the Debtor was returned by Ameriquest. See

       Exhibit 11, Deposition Exhibit 11.

47.    Scrolling forward to Page 022 of 034 of Exhibit 13, Ameriquest indicates that the next payment

       of $820.11 was posted on 03-10 (2003). At this time, now more than four months into the

       chapter 13 case, Ameriquest is applying debtor's post-petition payments to the pre-petition

       period.

       1.    Ameriquest took the 03-10 (2003)  payment in the AMOUNT of $820.11 and

             $129.59 from a SUSPense account, so that $820.11 plus $129.59 equals $949.70, the

             amount due for the October, 2001 pre-petition payment.

       2.    The next column to the left with the "APP" date of 03-17 (2003) indicates that the

             DUE date has advanced to 11-01 (November, 2001).

48.    The Court's attention is directed to the fact that the SUSP line fails to show a running balance in

       the suspense account.

49.   On 04-21 (2003) Ameriquest received a payment of $850.00. It applied $24.63 to LC/FEES,

and the remainder of $825.37 to SUSP; it did not advance the contractual due date.

50.   It was not until May 27, 2003, after receiving another post-petition payment of $900.00, that

the pre-petition contractually due date was advanced to 12-01.

51.   Ameriquest took the payment in the AMOUNT of $900.00 and $49.70 from a SUSPense

account, equal to $949.70. It applied $36.68 against the principal balance outstanding, and

$913.02 as interest paid, thus reducing the principal balance from $87,649.99 to $87,613.31.

52.   At the Deposition (Exhibit 10, pages 110/1 - 111/4), Judi Johnston confirmed that the post-

petition payment was applied to a pre-petition contractual payment.

00110

1   I'll go over this in more detail.

2       In May of 2003, after Ms. Nosek had

3   been in bankruptcy for a while, I'm looking at

4   the line item, May 27, '03, and the comment is

5   two lines, and it says, "March 1, '03

6   post-petition payment. Applied 11/1/01 payment

7   with funds from suspense."

8       Can you explain to me what was done?

9   You're got a post-petition payment made --

10      A.   Of $900, was received.

11      Q.   Okay.

12      A.   Okay? We credited her -- we gave her

13   her credit, moved her post-petition payment due

14   date up by a month. Her contractual payment back

15   then, she was due for November 1, 2001. The

16   payments were roughly $950 contractually. So she

17   paid 900. In order for me to move her due date

18   contractually I had two -- I had two choices. I

19   could have thrown the $900 into suspense, which

20    we did not do, or I can pull the amount that's
21    short to post the contractual payment. Since I've
22    already moved her due date, post-petition due
23    date forward, we took $49.70 from suspense,
24    combined it with the $900 to post a full

00111
1    contractual payment.
2        Q.    And the contractual payment was for a
3    pre-petition contractual payment, correct?
4        A.    Yes.

53.    The Mortgage Loan History not only confirms Debtor's allegations about the application of

post-petition payments to pre-petition arrears, it also confirms Debtor's allegations that she did

not receive proper credit for post-petition payments tendered.

54.    Debtor's variable rate loan agreement Ameriquest provides for semi-annual adjustments in the

interest rate charged, effective January 1st and July 1st, and thus increases or decreases in the

amounts of the monthly payment due.  See Exhibit 4 for a tabulation of the amounts due.

55.    During calendar years 2003 and 2004, when Debtor tendered post-petition payments, the

correct monthly amount due was less than the pre-petition payments due.

56.    During the second half of calendar year 2002, when the Debtor filed this chapter 13 case, the

amount of the monthly payment due was $820.96.  By applying her post-petition payments,

which were tendered in the correct amounts due, to pre-petition monthly payments which had

higher monthly payments due, Amerquest failed to give the Debtor proper credit for her post-

petition payments.

57.    Ameriquest's "Mortgage Loan History", attached as Exhibit 13 dated 4-22-05, states that the

net monthly payment due is $759.67, when in fact, commencing January 1, 2005, the correct

amount due is only $728.14. The $759.67 figure is the amount due for the June, 2003,

payment.

58.     The Mortgage Loan History also confirms that Ameriquest fails to distinguish between

payments from the chapter 13 Trustee, and those made by the Debtor.

59.     A Summary of Disbursements from the office of the Chapter 13 Trustee to Ameriquest is

attached here as Exhibit 19.

60.     By way of example, on May 28, 2004, the Trustee remitted $2,527.20. That payment was

posted by Ameriquest on 06-14 (2004) with the same TYPE/TRANS - 1 73 - as payments

received from the Debtor. See Pages 007 and 008 of 034 of Exhibit 13. That payment was

applied to post-petition months of November and December, 2002, and January, 2003.

61.     Similarly, a payment of $1,350.00 was remitted by the chapter 13 Trustee on July 23, 2004,

and posted by Ameriquest on 08-02 (2004) to SUSPense. That payment was applied to the

March, 2003, payment due.

62.     A subsequent payment was remitted by the Chapter 13 Trustee on 08/27/2004 in the amount

of $1,139.12. It was posted first to SUSPense before being applied to the May, 2003 payment

due.

63.     The final remittance from the chapter 13 Trustee on 2/25/2005 was posted by Ameriquest on

03-26 (2005) to SUSPense.

64.     The fundamental flaws in Ameriquest Mortgage Company's accounting system have been

known for some time.

65.     An account summary prepared on March 04, 2002, attached as Exhibit 18, in the context of a

prior chapter 13 filing by Ms. Nosek states on the last page, "MULTIPLE IR CHANGE

PERIODS CROSSED - CALCULATIONS ARE SUSPECT"

66.    The Lenstar notes, attached as Exhibit 15, also reflect an awareness by Ameriquest and

Buchalter, Nemer, Fields & Younger employees that post-petition payments were being

applied to pre-petition, "contractually due", periods, see, e.g. the notes entered on 9/17/04 and

6/8/2004, discussed below.

67.    That concern was not shared at the managerial level. The Lenstar notes dated 12/30/2004 state

in part: "... LC [Local Counsel] believes that the court will not look favorably upon DC

[Debtor's counsel] if he continues to press this matter because to an extent, it will be perceived

as the borrower's attempt to corner AMC into modifying the obligation ***based upon simple***

***accounting mistakes***. ..." (Emphasis added.)

68.    Debtor has also alleged that Ameriquest failed to post payments tendered in a timely fashion.

The Lenstar notes dated 10/28/2004 state:

"Rcvd money order # 06531550165 iao 700.22 dated 3-16-04 and personal check
#1079 iao $25.00 dtd 3-15-04. Funds rcvd were forwarded to AMC from BNFY as
they were recovered from BNFY's file. Frwd to cashiering to apply to the loan."

69.    Debtor has also alleged that Ameriquest failed to post payments tendered in a timely fashion

and kept funds in a Suspense Account. The Lenstar notes dated 10/29/2004 state: "Sent email

to Cashiering Department to make the following changes:

"Move $1095 in foreclosure fees to non-recoverable as soon as possible. The breakdown is as
follows:

| Amount: | Reason Code |
|---------|-------------|
| $180.00 | FCST |
| $180.00 | FCST |
| $735.00 | FCST |

"In addition, please waive late fees as of 11/01/02 iao of $376.87 ***and post all funds in
suspense to pmts.***" (Emphasis added.)

70.    Further evidence that Ameriquest does not have accounting systems in place to separately track

pre- and post-petition payments due is found in the Lenstar notes. On 9/17/2004 and again on

9/21/04 the Lenstar notes state:

"Sent the following to Matt @BNFY via urgent e-mail:

"Reviewed payment history with Natasha - debtor skipped 3 post payments since
11/02 and have not paid their additional payments monthly. ***Due to the fact that MSP
will not allow payments to be applied at the post amount only the contractual
amount (if the loan is not escrowed), payment history was reviewed as follows
...***" (Emphasis added.)

71.    At her deposition, Exhibit 10, Ms. Johnston testified that all of the accounting was performed

in-house by Ameriquest, and that employees at Buchalter only had access to Lenstar notes, and

not to Ameriquest's accounting system. She testified as follows:

00147
1      A.   Buchalter does not have access to our
2    accounting system. They only have access to
3    Lenstar. So whoever the associate would be would
4    say, "Okay, what is the payment amount that is
5    due for whatever post-petition payment?" They'd
6    have to go out of Lenstar, go into what's called
7    MSP.
8      Q.   What's that stand for?
9      A.   I haven't the foggiest idea.
10     Q.   When you talk about "they" going
11   out you're talking about the bankruptcy --
12     A.   The bankruptcy associate.
13     Q.   At Ameriquest?
14     A.   At Ameriquest, would log in to MSP and

15    find out what the payment amount was. Find out

16    the due date. It would not be retained and

17    tracked formally unless a note was made -- it's

18    -- Lenstar isn't going to say, "Oh, a payment

19    posted. I'm going to pull it and put it into our

20    records." That has to be manually done by someone

21    looking --

22        Q.    Someone at Ameriquest?

23        A.    Someone at Ameriquest.

24        Q.    So at Buchalter they have access to

00148

1    Lenstar.

2        A.    Yes.

3        Q.    If they want accounting information

4    they at Buchalter have to contact someone at

5    Ameriquest.

6        A.    Yes.

7        Q.    Their computer system isn't integrated

8    directly.

9        A.    No.

10        Q.    Was it ever?

11        A.    No.

12        Q.    So they never had access.

13        A.    No.

14        Q.    Do you recognize the name of Jason

15    Syndergaard? Does Jason --

16        A.    You know, the name is familiar, but I

17    don't know if he was with Buchalter or if he's

18    with us, AMC. Ameriquest Mortgage Company.

19        Q.    Are you saying that Exhibit number 5

20    contains accounting information that was drawn

21    from Ameriquest's computer system?

22        A.    It appears to be.

23      Q.    Was this one of the screens that you

24    looked at when you prepared your spreadsheet?


00149

1      A.    No.

2      Q.    Would you recognize this screen as

3    being an Ameriquest screen? It has to be.

4      A.    Yes. Although there are other

5    servicers who use that, but --

6      Q.    It has Ameriquest's name on it?

7      A.    Right.

8      Q.    It has Ms. Nosek's name on it.

9      A.    Again, it's imported from another

10    system, so --

11      Q.    Well, another system at Ameriquest.

12    Isn't it? I mean, does Ameriquest ever contract

13    out its accounting to somebody else?

14      A.    No.

15      Q.    So it's all in-house. All the

16    accounting is in-house, right?

17      A.    Yes.


72.    The Lenstar notes corroborate the fact that Ameriquest has no systems in place to track

payments received from the Chapter 13 Trustee. For example, the Lenstar notes on 9/10/2004

state:

"Called trustee office to request a copy of the disbursement ledger. Awaiting copy."

73.    On that same day, the notes state:

"Rcvd trustee disbursement ledger from trustees office. Frwd to SS to complete a

payment history."

74.  On 6/8/2004 at 6:29:59 PM  the Lenstar notes from Matthew Piersall to Maria Ornelas state:

"DC [Debtor's Counsel] contacted  LC [Local Counsel] (Brian Hachey @
Ablitt/Caruolo) and is concerned that post payments are going to suspense and are not
being applied. Please confirm post payments are being applied."

75.  One half hour later at 7:01:47 PM Maria Ornelas wrote to Amie Tancas:

"There is a difference in post petition payments vs. contractual payments.. Therefore
once the pmts are received the post due is moved to the next date, however **the
system wont apply the funds until the contractual pmt matches the post."**

(Emphasis added.)

76.  The *Affidavit of Jacalyn S. Nosek in Support of Debtor's Motion for Partial Summary
Judgment, or in the alternate for Judgment on the Pleadings, on the Issue of Liability
Only*, contains a detailed analysis of mis-application of the payments she tendered.

77.  The Debtor has also questioned the amount of legal fees and costs added by Ameriquest to her
account.

78.  An e-mail from Johnnelle Gomez to John Teston appears in the 4/11/2003 Lenstar notes. In
relevant part it states:

"Hrg results from LC:
"The court denied stay based on representation that she will cure within 30 days. I received
two money orders one for $850 and one for $820,11 Checks are on their way overnight.
"Here are the issues debtor would like resolved:
    1. How much is in escrow?
    2. Buchalter's attorney's fees? In referal you say that attys fees are $1060 plus
    cost for motion; so $875 for motion and $150 for my appearance leaves $910.
    Usually your fees are $460. ..."

79.  At the Deposition, ( Exhibit 10#, pages 107/3 - 108/23), Judi Johnston discussed the
assessment of bankruptcy fees and costs:

00107

...

3    Q.    You've got a category here called a

4    "foreclosure fee assessed" and a category called

5    "foreclosure cost assessed". What's the

6    difference between the two?

7    A.    Fees are like in the case of an

8    attorney, it would be attorneys' fees in order to

9    process it, and then a cost would be something

10   that was a hard cost, like a filing fee, court

11   filing fee.

12    Q.    Are there fees --

13    A.    Or mailing fees -- mailing costs. If

14   it cost us two-70 to send a certified letter,

15   that would be a cost.

16    Q.    Are the fees assessed against the

17   debtor the actual costs that are paid by

18   Ameriquest?

19   A.    Yes.

20   Q.    So there's no markup involved here?

21   A.    No.

22   Q.    Somewhere if we went back and looked

23   we'd find a bill, for instance, on June 20, 2001

24   for $1,000?

00108

1    A.    Yes.

2    Q.    What's the difference between

3    bankruptcy fees assessed and bankruptcy court

4    costs assessed?

5    A.    Same thing. Attorneys' fees versus

6    filing fees.

7    Q.    So when it's called bankruptcy fees

8    it's bankruptcy attorney fees? Is that --

9      A.   Well, it may or may -- usually an

10    attorney handles bankruptcy.

11      Q.   Right.

12      A.   The normal average Joe on the street

13    does not. So we'll send it to an attorney's firm.

14    It's usually -- the charges could include what

15    it's going to cost to file the proof of claim,

16    review it --

17      Q.   Those would be called bankruptcy fees?

18      A.   Those are fees. The costs are anything

19    like --

20      Q.   Filing a motion for relief, there's a

21    fee paid to the court, and you consider that

22    costs.

23      A.   That would be broken down as a cost.

80.    The *Affidavit of Jacalyn S. Nosek* and the account analysis attached to it that Ms. Nosek

prepared, tabulates Ameriquest's purported fees and costs. Debtor suggests that the amounts

claimed to have been disbursed for court costs are excessive and incorrect.

81.    Ameriquest's records indicate that Debtor is being charged for the legal fees billed to

Ameriquest for work associated with responding to the accounting questions Debtor has raised,

which Debtor has established as having a basis in fact.

82.    A question has also arisen concerning Ameriquest's relationship with the law firm of Buchalter,

Nemer, Fields & Younger, which has also billed Debtor's loan account for legal services.

83.    At the Deposition (Exhibit 10, page 188/3 - 189/23),  Judi Johnston testified that Adam J. Bass

is both a senior executive vice president at Ameriquest, and is also an attorney at Buchalter,

Nemer, Fields & Younger:

00188

...

8      Q.    There is an article that appeared in

9    American Banker which says that a gentleman named

10    Adam Bass is a senior executive vice president in

11    Ameriquest. Is that correct?

12      A.    Yes.

13      Q.    Is that his correct title?

14      A.    I believe so.

15      Q.    Drawing your attention to Exhibit

16    number 6, the Request For Special Notice, on the

17    very top it says that Adam J. Bass is an attorney

18    at Buchalter.

19          (Handed to witness.)

20      A.    Is that a question?

21      Q.    Is he an attorney at Buchalter?

22      A.    Yes, he is.

23      Q.    Are there any other employees of

24    Ameriquest who are also employees at Buchalter?

00189

1      A.    No.

2      Q.    Does Buchalter have any clients other

3    than Ameriquest?

4      A.    I wouldn't know.

5      Q.    What is Mr. Bass' business address?

6    Does he work at the Ameriquest offices?

7      A.    For his Ameriquest employment, his

8    job, yes.

9      Q.    Is he a full-time employee of

10    Ameriquest?

11      A.    I don't know.

12      Q.    Do you know who would know besides

13    him?

14      A.    Adam Bass would know.

15    Q.    Would the HR department know?

16    A.    Yes.

17    Q.    Who is the manager of HR?

18    A.    It was Lori Grigg.

19    Q.    G-r-i --

20    A.    -- -g-g, I believe.

21    Q.    Okay.

22    A.    There might be an S on the end of it,

23    but I'm not sure.


CONCLUSION

The documents produced by Ameriquest confirm the Debtor's allegations that the Defendant

Ameriquest Mortgage Company failed to keep accurate accounting records, and that the Defendant

failed to differentiate between pre-petition mortgage arrears owed by the Debtor, which are paid

through the Debtor's Chapter 13 Plan as administered by the Standing Chapter 13 Trustee, and post-

petition payments tendered by the Debtor.

In "servicing" this Debtor's account, Ameriquest applied payments received from the Debtor,

intended to be applied to post-petition obligations, to pre-petition arrears, and in the later stages of the

pending chapter 13 case, applied payments received from the Chapter 13 Trustee to post-petition

payments.

The documents produced by Ameriquest confirm the Debtor's allegations that payments made

by the Debtor were placed in a suspense account, as were payments received from the Chapter 13

Trustee, and that Amerquest's computerized accounting systems do not show a running balance in the

suspense account.

These systemic accounting inaccuracies manifested themselves in different ways: the payoff

amounts provided when Debtor attempted to refinance were incorrect; as were the amounts of the

monthly payments due.

    WHEREFORE, Debtor requests that judgment enter in her favor and against Defendant

Ameriquest Mortgage Company, and that a evidentiary hearing be scheduled on the issue of damages.

                                        Jacalyn S. Nosek
                                        by her attorney,


                                        /s/ Philip M.  Stone
                                        Philip M. Stone, BBO # 544139
                                        44 Front Street
                                        Worcester, MA  01608
                                        Tel. (508) 755-7354
                                        Fax.  (508) 752.3730
                                        E-mail: pstonelaw@rcn.com


Dated:        September 13, 2005

<u>CERTIFICATE OF SERVICE</u>

I, Philip M. Stone, do hereby certify on this day I electronically filed the foregoing pleading with the United States Bankruptcy Court for the District of Massachusetts using the CM/ECF System.  I served the foregoing document on the following CM/ECF participants:

Robert Charlton, Esq.

I further certify that I have mailed this day by first-class mail, postage prepaid, a copy of the aforementioned pleading electronically filed with the Court on the following non-CM/ECF participants:

Jacalyn S. Nosek
60 Bolton Road
PO Box 1311
S. Lancaster, MA 01561

/s/ Philip M.  Stone
Philip M. Stone

DATED:        September 13, 2005