UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | | |
|---|---|---|
| _____ ) | | |
| In re ) | | Chapter 13 |
| Jacalyn S. Nosek, ) | | Case No. 02-46025-JBR |
|       Debtor. ) | | |
| _____ ) | | |
| ) | | |
| Jacalyn S. Nosek, ) | | |
|       Plaintiff, ) | | Adversary Proceeding |
| ) | | Case No.  04-4517 |
| v. ) | | |
| ) | | |
| Ameriquest Mortgage Co., ) | | |
|       Defendant. ) | | |
| _____ ) | | |

**MEMORANDUM OF DECISION**

This matter came before the Court for trial on Counts One (Violation of TILA), Two (Violation of RESPA), Three (M.G.L. c. 93A), Four (Unjust Enrichment), Five (Breach of the Implied Covenant of Good Faith and Fair Dealing), Six (Infliction of Emotional Distress), and Seven (Lost Income).

In reaching its determinations, the Court considered the entire six (6) days of testimony given by five (5) witnesses, considered the demeanor and credibility of the witnesses, reviewed thirty-six (36) exhibits totaling many hundreds of pages admitted in evidence, heard arguments of counsel, and reviewed the various pre- and post-trial pleadings submitted in support of each party's position.  The following decision constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bank. P. 7052 with respect to the counts of the complaint.

**<u>Background</u>**

On November 25, 1997, Ms. Nosek ("Plaintiff") entered into an adjustable rate note ("Note") with Ameriquest Mortgage Company ("Defendant") in the amount of $90,000.00. (P.Exh. 1).  The money was used to pay off a $37,000.00 note owed to the Money Store and multiple outstanding bills, and an unspecified sum was invested in an internet marketing venture. Approximately one year later, the internet marketing venture failed causing the Plaintiff to lose at least $10,000.00.[1]

The Plaintiff's primary source of income, before the failed internet marketing venture, had been tutoring middle school and high school students at her home.  Generally, students came in for forty-five (45) minute sessions twice a week.   The Plaintiff charged $50.00 per session. When her tutoring business was thriving, she taught between 30 -32 hours per week.  The Plaintiff ran her tutoring business intermittently for over ten years.[2]  In the year prior to her entering into a loan agreement with the Defendant, the Plaintiff testified that it  had been a normal tutoring year and that she had been able to maintain regular hours.

The Plaintiff has a history of depression that reaches back to 1988 when her mother passed away. In September 1990, she was hospitalized for depression and post-traumatic stress disorder at Charles River Hospital in Wellesley, Massachusetts for approximately six (6) weeks. By the second week, the Plaintiff went home during the day to teach her students and then returned to the hospital in the evening.  In May 1996, her father passed away and the Plaintiff suffered another severe bout of depression.  She was not hospitalized at that time.  In early 2001,

---

[1]  The amount the Plaintiff actually lost was not provided.  She admitted in her testimony that she lost more than $10,000.00.  No evidence was presented to provide the Court with an exact figure of her financial loss.

[2]  Prior to 1997, the periods of reduced hours of tutoring corresponded with the illness and death of her mother, aunt, and father.

her depression was being managed by her psychiatrist and psychologist[3] and was not preventing
her from tutoring.

In August 1997, the Plaintiff had to curtail her tutoring hours due to a heart condition that
caused her to be hospitalized.  Despite her condition, the Plaintiff was able to temporarily
increase her tutoring hours to normal levels and to start the ultimately unsuccessful internet
marketing venture near the end of 1997.  In the spring of 1998, the Plaintiff experienced further
medical issues that resulted in a reduction of the number of hours that she was able to tutor; this
reduction lasted for approximately one and one half years.  She was, however, still able to make
the payments on the Note with the Defendant.

By 2000 the Plaintiff was struggling to make payments on the Note.  She missed
payments on her Note in the spring and then again in the fall of 2000.  In early 2001 a
representative of the Defendant called the Plaintiff requesting a payment of $6,000.00.[4]  The
Plaintiff made two payments that together equaled two full monthly payments, but these
payments were returned by the Defendant, and it moved forward with a foreclosure proceeding
on the Plaintiff's home.  This prompted the Plaintiff to file her first bankruptcy on May 15, 2001,
Case No.  01-43293.  Despite the bankruptcy filing, the public auction of the home was not
canceled until the morning of the advertised auction which, according to the Plaintiff, was a few
weeks after her bankruptcy filing.  Eventually the bankruptcy case was dismissed upon motion
by the Trustee.

On February 28, 2002 the Plaintiff filed a second bankruptcy petition, Case No. 02-

---

[3]  The Plaintiff's treatment for depression has been ongoing since 1989.

[4] The Plaintiff was told that she was behind on three payments and that late charges had
been assessed; she believed she was only two payments in arrears.

41217, in response to a second notice of foreclosure from the Defendant.  The second bankruptcy

was subsequently dismissed as well.

On October 2, 2002 the Plaintiff filed her third and current bankruptcy petition, Case No.

02-46025, again in response to a foreclosure notice.  The Plaintiff's Chapter 13 Plan was

confirmed on January 16, 2004.[5]  (Case No. 02-46025, Doc. 78) The Defendant received

adequate notice of the Plan and of its subsequent confirmation.  Over the year prior to plan

confirmation, the Plaintiff made her post-petition payments directly to the Defendant or its

counsel.  Since 1997 the Plaintiff often sent the payments late and was assessed a late charge.

Generally, she included an amount to cover the late charge with her payment.

In June 2003, the Plaintiff and Defendant entered into a stipulation resulting from the

Defendant's Motion for Relief from the Automatic Stay.  (Case No. 02-46025, Doc. 45) In the

Motion for Relief from the Automatic Stay, the Defendant alleged that the Plaintiff had failed to

make post-petition payments for December 1, 2002 through February 1, 2003 and had pre-

petition arrearage of approximately $19,789.14.[6]  (Case No. 02-46025, Doc. 29)  The stipulation

was approved by the Court on July 9, 2003.  (Case No. 02-46025, Doc. 49) The stipulation

provided that the Plaintiff would pay the remaining outstanding post-petition arrearage of

approximately $394.89 as well as legal fees and costs totaling $1,175.00.

In November/December 2003, the Plaintiff spoke with a mortgage broker in Providence,

---

[5]  Pursuant to Fed. R. Evid. 201(c), the Court takes judicial notice of the Plaintiff's related bankruptcy including orders issued by the Court and  motions filed by the parties.  The Court may take judicial notice of the documents in the debtor's file.  *In re Hyde*, 334 B.R. 506, 509 (Bankr. D. Mass. 2005).  *See In re Nail*, 195 B.R. 922 (Bankr. N.D. Ala. 1996).

[6]  On April 8, 2003, the Court entered an order continuing the hearing on the Motion for Relief from the Automatic Stay and gave the Plaintiff thirty (30) days to become current in all post-petition arrears, except attorney's fees.  (Case No. 02-46025, Doc. 38)

Rhode Island, Paul Kerens (phonetic), regarding refinancing her mortgage with another lender.

The Plaintiff testified that in order to proceed with the refinancing, she needed to provide the

mortgage broker with a pay-off figure from the Defendant, a pay-off figure from the Trustee, tax

statements, and a payment history from the Defendant.  In March 2004, the Plaintiff contacted

the law firm representing the Defendant, Ablitt & Caruolo, PC, to request a payment history.

(P.Exh. 6) The Plaintiff was informed that she must provide written authorization, which she did,

via fax, on April 26, 2004.  On May 5, 2004, the Plaintiff's counsel called the Defendant's

counsel because the payment history had not been received.  Ablitt & Caruolo did not have any

record of receiving the Plaintiff's original written authorization; her counsel therefore faxed it to

Ablitt & Caruolo for a second time on May 5, 2004.  A twelve-month payment history

("Payment History") was finally faxed to the Plaintiff's counsel on May 10, 2004.  (Pl. Exh. 5)

The Payment History showed the dates that the payments had been placed into suspense,

the contractual due date of the payment, and the amount received.  (Pl. Exh. 5) It also showed

that all of the Plaintiff's payments over the preceding twelve months had been placed into

suspense.  In an affidavit to the Court[7], the Defendant defined suspense accounts as "a term

given to those funds credited to a debtor's account not sufficient to make a full mortgage

payment."  (Pl. Exh. 11-2, Bates Stamp 000110) The affidavit continued "'Suspense Accounts'

are a functionality of loan servicing computer systems used by the lending industry to distinguish

---

[7] On two separate occasions, this Court requested that the Defendant provide a memo explaining the basis in the Defendant's documents and/or law for its use of suspense accounts. See Case No. 02-46025, Docs. 98 and 103.  On November 2, 2004, the Court sanctioned the Defendant $500.00 for its failure to comply with its previous two orders.  On November 9, 2004, the Defendant submitted an affidavit from Ben Vittali, Bankruptcy Manager of Ameriquest Mortgage Company, entitled "Declaration by Ameriquest Mortgage Company, Use of Suspense Accounts."  (Pl. Exh. 11-2, Bates Stamp 000110)

partial or over-payments on a loan as they relate to contractual and post-petition due dates." *Id*.

"The 'Supsense Account' allows lenders to accept short payments that would otherwise be

returned to the Debtor for failing to fully comply with the terms and conditions of the

mortgage."[8]  *Id.*  In other words, suspense is used as a collection bucket in the lending industry.

It holds insufficient payments until cumulatively the monies received equal a loan payment that

is due and, at least in theory, are then applied to the oldest outstanding contractual payment.

      According to the Plaintiff's testimony, she was unable to move forward with the re-

financing of her home because she could not get an accurate payment history from the

Defendant.  She did not provide the mortgage broker with any of the other documentation that

was required to proceed with the refinancing.  She further alleged that the Payment History did

not accurately represent her payments post-petition.  (Tr. Day 2, p. 43, L. 10) She was

"astounded that - - that my payments were not going for what I understood they were supposed

to go for."  (Tr. Day 2, p. 48, L. 10-11) She further stated that "every payment appears to be

short."  (Tr. Day 2, p. 49, L. 11)  The Plaintiff explained that she received letters from the

Defendant that told her the amount to send for each payment.[9]  According to the Plaintiff, she

---

      [8]  The Court does not here determine if the Defendant's interpretation of its right to use suspense accounts this way or to return short payments is legally correct.

      [9]  The Plaintiff had an adjustable rate note whereby every six (6) months the interest rate would change.  The adjustments would occur on January 1st and July 1st each year.  The Defendant sent the Plaintiff letters reflecting the new interest rate, the new payment amounts due, anf the date upon which it went into effect approximately two (2) months prior to any change.  (Pl. Exh. 3) After filing bankruptcy the Plaintiff also received a form letter that said "Pursuant to the terms of the Note, the monthly payment amount is subject to an interest change every six months.  Although the prepetition amounts owed to AMC have been set forth in AMC's proof of claim filed with the court, the postpetition payments may change every six months in accordance with the terms of the Note."  (Pl. Exh. 3)

made her post-petition payments based upon the information in these letters.

Despite what the Payment History showed, the Defendant testified that the Plaintiff received proper credit for her payments. The Defendant maintained two different accountings: one through a computer loan servicing program[10] which tracked contractual obligations[11] due under the Note and another done manually by a bankruptcy specialist who tracked the post-petition due dates. Through the loan servicing program, each payment received,[12] regardless of the source, was automatically matched to the oldest contractual obligation due. If the amount received was not sufficient to pay the contractual obligation according to the loan servicing program, the payment was placed in suspense. When the next payment was received, it was placed in suspense and if the total in suspense then equaled a contractual obligation, then the oldest outstanding contractual obligation was deemed paid, at least in theory.[13] Any monies that

---

[10] The loan servicing program used by the Defendant to maintain accounts, Mortgage Servicing Platform ("MSP") also known as Fidelity National Information System, kept track of the contractual amounts owed and when they came due. According to the Defendant, this program is used by most of the national servicers. (Pl. Exh. 11-2, Bates Stamp 000110)

[11] The contractual obligation is the oldest payment owed to the Defendant according to the Note regardless of whether the due date is pre- or post-petition.

[12] The evidence regarding application of payments to the accounts held by the Defendant came from the deposition of Judi Johnston. (P. Exh. 10) Ms. Johnston was a litigation support manager in the Defendant's legal department. At the time of the deposition, she was designated as the person who had the most knowledge about the transactions regarding the Plaintiff's account. After reviewing the Defendant's computer records, she created a detailed payment history ("Detailed Payment History") (Pl. Exh. 11-9) of the Plaintiff's Note. In her deposition, she explained how the Defendant applied payments made by borrowers in and out of bankruptcy. Ms. Johnston was no longer an employee of the Defendant at the time of the trial.

[13] This procedure is what two different employees of the Defendant said in deposition and in an affidavit was followed by the Defendant. Assuming the Defendant had the right to place the payments into suspense, the evidence shows that the Defendant was not applying the monies in suspense as soon as there was enough to satisfy a contractual obligation. The Detailed

exceeded the amount of the monthly contractual obligation due remained in suspense until the next contractual obligation could be satisfied.  (P. Exh. 10, Bates Stamp 000085, p. 134, L.1 -12) The loan servicing program did not distinguish between pre-petition and post-petition payments; it merely looked at whether the payment received satisfies the oldest contractual obligation due.

Simultaneously, the Plaintiff was also being credited for making timely post-petition payments in a manual accounting maintained by an employee in the Defendant's bankruptcy department.  If the payment received from the Plaintiff satisfied the post-petition amount due, then the bankruptcy specialist advanced the Plaintiff's post-petition payment schedule one payment and her payment  was deemed current by the Defendant.[14]  (Pl. Exh. 10, Bates Stamp 000085, p. 134, L.13-14)  According to Ms. Johnston, a litigation support manager in the Defendant's legal department, the bankruptcy specialist looked at a payment received and determined that "[w]e may not have enough money to post contractually, but I'm going to advance her due date post-petition forward a month, because she satisfied the requirement - - for making the post-petition payment that was due."[15]  (Pl. Exh. 10, Bates Stamp 000076, p. 100, L. 2-8)  The methods of tracking an account in bankruptcy by the Defendant occurred without the knowledge of the Plaintiff.  This procedure was not mentioned in any of the Note or mortgage documents.  Moreover, the Payment History faxed to the Plaintiff's counsel did not reflect this

---

Payment History shows that at times enough funds were being held in suspense to satisfy several months of contractual payments and indeed the Payment History faxed to the Plaintiff's counsel showed that all of her post-petition payments were put in suspense and remained there.

[14] As a result of the system the Defendant has designed, the system shows the Plaintiff as perpetually deliquent.

[15] It is common with adjustable rate notes that pre-petition and post-petition amounts due are different.

manual accounting; it created the impression the Plaintiff was delinquent in her payments.

On July 23, 2004, the Plaintiff sent a written request to Ablitt & Caruolo, P.C. requesting that the Defendant comply with its statutory obligations under the Real Estate Settlement Procedures Act and Massachusetts General Laws Chapter 93A. (Pl. Exh. 6) Specifically she requested that the Defendant prepare a "proposal" that addressed the accounting discrepancies she alleged were contained in the Payment History she received on May 5, 2004. She also requested a "proposal" for the payment of damages suffered as a consequence of the Defendant's unfair and/or deceptive acts or practices pursuant to M.G.L. c. 93A and financial damages she incurred as a result of the Defendant's improper handling of her account. (Pl. Exh. 6)

On August 11, 2004, the Plaintiff filed a "Motion to Determine the Amount of Liens." (Case No. 02-46025, Doc. 92) The motion was set for hearing on September 7, 2004.[16] The Court continued the hearing until October 5, 2004 and ordered the Defendant "to provide a detailed accounting in writing and file a copy in court within 15 days." (Case No. 02-46025, Doc. 98) The Court also ordered the Defendant to file "a memo within 15 days explaining the basis in their documents and/or law for their use of so called 'suspense accounts.'" (Case No. 02-46025, Doc. 98) On September 23, 2004, the Defendant filed a "Statement and Accounting" in response to the Court's Order. (Case No. 02-46025, Doc. 100) On October 5, 2004, the hearing was continued until November 2, 2004. The Defendant was again ordered by the Court to comply with the Court's Order from September 7, 2004 no later than October 21, 2004. (Case No. 02-46025, Doc. 103) The Defendant was also ordered to "reconcile its numbers" with the Plaintiff's counsel within two weeks. *Id*. At the hearing on November 2, 2004, the Defendant

---

[16] See FN 5.

was sanctioned $500.00 for its failure to comply with the Court's orders from September 7, 2004

and October 5, 2004.  (Case No. 02-46025, Doc. 107) The Court further ordered "Debtor shall

file an adversary proceeding against Ameriquest concerning the amount of its liens and

Ameriquest's apparent inability to provide an accurate accounting."  (Case No. 02-46025, Doc.

107)

The Plaintiff made her last payment to the Defendant in August 2004.

### Discussion

### Count One: Truth in Lending Act

The Plaintiff alleged in her complaint that the Defendant had failed to comply with

Regulation Z, 12 C.F.R. §§226.20(c), which requires a lender, to provide written notification to a

mortgagor when there is going to be an adjustment to her interest rate on variable rate

mortgages.  The Plaintiff alleged that the Defendant had incorrectly computed the interest rate to

be charged, effective July 1, 2003, and therefore the written notifications from the Defendant

were incorrect.

At final arguments, over one month after testimony had concluded, the Plaintiff's counsel

conceded that the Defendant had not been in violation of 12 C.F.R. §§226.20(c).  The Plaintiff's

Counsel stated:

> When I drafted the complaint, Your Honor, I wasn't aware at that time, I hadn't
> figured out what the defendant had done in terms of how it was applying
> payments.   When it became apparent to me, as the evidence shows, that it wasn't
> that they were using a wrong interest rate figure.  They were - - the correct
> interest rate figures are stated on the letters that they sent twice a year to Nosek.
> (Trial Tr., 21-22, March 8, 2006).

Plaintiff's counsel never explained when it became apparent to him.  No testimony was heard

-10-

regarding Count One.  The Court is disappointed that it was not until oral arguments that the

Plaintiff's counsel stated that the Defendant had been applying the correct interest rates.  The

Court wasted several hours examining voluminous exhibits entered into evidence in lieu of live

testimony trying to determine whether the Defendant had violated 12 C.F.R. §§226.20(c).  The

Court wants to remind counsel that it is incumbent upon them to make the Court aware of causes

of action that have been resolved or waived.

The Court hereby dismisses Count One.

Count Two: Qualified Written Request under the Real Estate Settlement Procedures Act

The Court granted partial summary judgment as to liability for the Plaintiff on October

25, 2005. (Doc. 39) The Court found that the letter sent to the Defendant on July 23, 2004 met

the requirements of a qualified written request pursuant to 12 U.S.C. §2605(e) of the Real Estate

Settlement Procedures Act ("RESPA").  Under 12 U.S.C. § 2605(e), "the servicer shall provide a

written response acknowledging receipt of the correspondence within 20 days (excluding legal

public holidays, Saturdays, and Sundays) unless the action requested is taken within such

period."  The Court found for the request to constitute a qualified written request "it must

conclude or otherwise enable the servicer to identify the name and account number  - -  account

of the borrower, not the number, and include a statement of reasons why the borrower believes

the account is in error."[17]  (Doc. 48)  In the instant case, the Court found that the "letter to the

defendant states the plaintiff's name and the basis for her belief her account was incorrect and

that payments were not being properly credited."  (Doc. 48)  In response to the motion for

_____

[17]  The Court read its findings into the record. Docket entry 48 is a transcript of the
Court's decision.

-11-

summary judgment, the Defendant gave a perfunctory denial in its answer but failed to address it

otherwise.[18]  The Defendant never disputed that the letter constituted a qualified written request,

nor did the Defendant argue that it had complied with the provisions of Section 2605(e) by

providing a written response acknowledging receipt of the qualified written request within

twenty (20) days or that it had taken action on the concern voiced in the letter from the Plaintiff.

The only remaining issue before the Court on this count is damages.

<u>Actual Damages:</u>

Under 12 U.S.C. §2605(f), the party failing to comply with the provisions of 12 U.S.C.

§2605(e) shall be liable to the borrower (i.e. Debtor) as follows:

> (1) Individuals.  In the case of any action by an individual, an amount equal to the
> sum of - -
> (A) any actual damages to the borrower as a result of the failure; and
> (B) any additional damages as the court may allow, in the case of a pattern or
> practice of noncompliance with the requirements of this section, in an amount not
> to exceed $1,000. . .  12 U.S.C. §2605(f)(1) (2006).

> (3) Costs.  In addition to the amounts under paragraph (1) or (2), in the case of
> successful action under this section, the costs of the action, together with any
> attorneys fees incurred in connection with such actions as the court may
> determine to be reasonable under the circumstances . . .  12 U.S.C. §2605(f)(3)
> (2006).

It is the Plaintiff's burden to show actual damages.  "The Plaintiff must establish that the

---

[18]  In the Defendant's response to the Plaintiff's motion for summary judgment, counsel
argued that the motion should be deemed waived because the motion failed to comply with the
Court's Pre-Trial Order which states "Any dispositive motions must be filed no less than seven
(7) business days prior to the date fixed for the filing of the joint Pre-Trial Memorandum or the
relief sought in such motions shall be deemed waived." (Doc. 7) The Pre-Trial Memo was due
on September 17, 2005 which was a Saturday, and therefore the due date was extended to
September 19, 2005.  The Plaintiff filed the motion for summary judgment on September 14,
2005.  At the hearing on October 25, 2005, the Court allowed the motion for summary judgment
to be filed and heard arguments.

economic injury was proximately caused by the bank's violation of the Real Estate Settlement

Procedures Act." *In re Tomesevic*, 273 B.R. 682, 687 (Bankr. M.D. Fla. 2002).  In the instant

case, the Plaintiff failed to establish how she was damaged by the Defendant not responding to

her qualified written request.  In testimony, the Plaintiff suggested that due to the Defendant's

failure to respond, she was unable to refinance her mortgage.  While the Court is sympathetic

and may agree with the Plaintiff's assertion, she did not provide a basis to award actual damages.

No documents were offered as evidence of the proposed refinancing.  No testimony was

proffered refinancing was even offered; there was no evidence of the terms of a refinancing

which the Plaintiff could expect to receive.  The Court only heard the testimony of the Plaintiff.

The Court does not mean to suggest that the testimony was not credible.  In the instant case, the

Court found all of the witnesses to be credible.  Instead, the Court is frustrated because it was not

provided with any numbers upon which to calculate an award for actual damages.  It is not the

Court's obligation "to sift through multifarious documents and testimony in an effort to

congregate those facts which are necessary to establish a party's action or defense" or damages,

*McGraw v. Allen* (*In re Bell & Beckwith*), 64 B.R. 620, 635 (Bankr. N.D. Ohio 1986), although

the Court notes it spent an extraordinary amount of time reviewing all of the evidence in an

effort to discern a basis for an award of damages under this count.  On the current record any

award of damages based in the Plaintiff's inability to refinance her loan on more favorable terms

would be mere speculation as would any assumptions about any out-of-pocket costs the Plaintiff

incurred.  The Court cannot base an award upon mere speculation.

In addition to pecuniary damages, courts have found that actual damages under RESPA

may include damages for emotional distress.  These cases determined that RESPA is a "remedial

consumer-protection statute." *Rawlings v. Dovenmuehle Mortgage, Inc*., 64 F. Supp.2d 1156,

1165 (M.D.Ala. 1999). *See also Johnstone v. Bank of America, N.A.*, 173, F. Supp.2d 809

(N.D.Ill. 2001); *Ploog v. Homeside Lending, Inc.*, 209 F. Supp.2d 863 (N.D.Ill. 2002).[19]  In

*Rawlings*, the court examined statutory language from other sections in RESPA as well as its

legislative history in reaching the conclusion that §2605 of RESPA was a consumer-protection

statute.  *Rawlings*, 64 F. Supp.2d at 1165 - 66.  The *Rawlings* court, as well as successive courts,

compared the language of §2605 to other federal consumer-protection statutes.  The court

concluded that the "actual damages" language was similar to the "actual damages" language of

other statutes where courts have allowed plaintiffs to recover actual damages for emotional

distress caused by violations of those statutes.  *Johnstone v. Bank of America, N.A.*, 173 F.

Supp.2d 809, 815 (N.D.Ill. 2001).[20]  The court determined that emotional distress damages may

be included in an actual damages award.

The Court finds the analysis in favor of including emotional distress damages in the

award for actual damages to be persuasive.  Whether emotional distress damages have been

suffered is an issue of fact to be determined by the factfinder, in this case, the Court.  If the Court

finds upon examination of the facts that the Plaintiff has suffered emotional distress due to the

---

[19] Other cases have found that actual damages are limited to pecuniary injury.  *See Katz v. The Dime Savings Bank, FSB*, 992 F. Supp. 250, 256-57 (W.D.N.Y. 1997) (§2605 was not a consumer protection statute), *In re Tomasevic*, 273 B.R. at 687.  *See also Aiello v. Providian Fin. Corp*., 239 F.3d 876, 881 (7th Cir. 2001) (The court acknowledged that if the plaintiff could show a financial loss, she may be permitted to include a claim for damages for incidental emotional distress).

[20] These statutes include the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Privacy Act, the Equal Credit Opportunity Act, and the Fair Housing Act.  *See Johnstone*, 173 F. Supp at 815 and *Rawlings*, 64 F. Supp.2d at 1166.

Defendant's violation of § 2605(e), then the Court must determine the amount to be awarded to the Plaintiff. *Rawlings*, 64 F. Supp.2d at 1167.

The same problems that plagued the Plaintiff in determining pecuniary damages plague her in emotional distress damages. In the instant case, the Court found that the Defendant violated §2605(e) when it failed to respond to a qualified written request sent on July 23, 2004. The Court heard testimony from the Plaintiff, her therapist, her psychiatrist, her pastor, and her primary care physician. The Court heard significant testimony about the emotional distress experienced by the Plaintiff over an extended period of time. In testimony, the Court learned about the Plaintiff's bouts of depression, insomnia, anhedonia[21], and flashbacks; these episodes were, however, never adequately linked to the Defendant's failure to respond to the qualified written request sent to the Defendant on July 23, 2004. In order to award emotional distress damages for the RESPA violation, the Plaintiff must show a causal link between the violation and the emotional distress. The Plaintiff failed to do this. The Court does not have any basis upon which to award emotional distress damages.

The Court therefore awards $1.00.

Statutory Damages:

Under RESPA, statutory damages may be awarded "in the case of a pattern or practice of noncompliance with the requirements of this section." 12 U.S.C. §2605(f)(1)(B) (2006). In *In re Maxwell*, the court determined that two instances of a failure to respond to a qualified written request did not qualify as a pattern or practice on noncompliance. *In re Maxwell*, 281 B.R. 101,

---

[21] Anhedonia is a medical term meaning a lack of interest in doing things; it is a symptom of depression.

-15-

123 (Bankr. D. Mass. 2002); *See also In re Tomasevic* (one qualified written request did not

qualify as a pattern or practice). The court in *Maxwell* determined that "pattern or practice"

should be "defined according to the usual meaning of the words" and that the term "suggests a

standard or routine way of operating." *Id.* In *Maxwell* the court found that the bank in question

serviced loans in most of the fifty states and therefore was unpersuaded that two instances

demonstrating a failure to respond to a qualified written request established a "pattern or

practice." *Id.* In the instant case the Plaintiff did not offer any evidence or testimony that the

Defendant, another large company that services loans in most if not all fifty states, had a practice

of not responding to qualified written requests.

The Court finds that the Plaintiff is not entitled to statutory damages of $1,000.00.

Costs and Attorney's Fees:

12 U.S.C. § 2605(f)(3) states:

(3) Costs. In addition to the amounts under paragraph (1) or (2), in the case of
successful action under this section, the costs of the action, together with any
attorneys fees incurred in connection with such actions as the court may
determine to be reasonable under the circumstances . . . 12 U.S.C. §2605(f)(3)
(2006).

The Court found that the Defendant violated 12 U.S.C. § 2605(e), therefore the attorney

for the Plaintiff is entitled to reasonable fees and costs associated with this cause of action. The

Defendant shall have until July 17, 2006 to file any objections to the application of Plaintiff's

counsel previously filed. Upon review and a hearing, the Court will determine reasonable fees

and costs to be awarded under this count.

<u>Count Three: MGL c. 93A, §§ 2 and 9</u>

The Court granted partial summary judgment as to liability for the Plaintiff on October

25, 2005 (Doc. 39).  The Court found the Defendant liable under Count Two (RESPA) and that

RESPA is a federal consumer protection statute.  Under 940 Code of Massachusetts Regulations

3.16, subpart (4), a violation of federal consumer protection statutes constitutes a *per se*

violation of M.G.L. c. 93A.[22]  940 MASS. CODE REGS. 3.16 (2006).  The remaining issue before

the Court on this count is damages.

Chapter 93A §9(3) states:

. . . if the court finds for the petitioner, recovery shall be in the amount of actual
damages or twenty-five dollars, whichever is greater; or up to three but not less
than two times such amount if the court finds that the use or employment of the
act or practice was a willful or knowing violation of said section two or that the
refusal to grant relief upon demand was made in bad faith with knowledge or
reason to know that the act or practice complained of violated section two.

It is the Plaintiff's burden to prove actual damages.  In the instant case, the Plaintiff has not met

her burden.  For the same reasons as stated under Count Two, the Court finds that the Plaintiff

provided insufficient evidence upon which the Court may base damages.

The Court awards statutory damages to the Plaintiff in the amount of $25.00.

Costs and Attorney's Fees:

Chapter 93A §9(4) states:

If the Court finds in any action commenced hereunder that there has been a
violation of section two, the petitioner shall, in addition to other relief provided
for by this section and irrespective of the amount in controversy, be awarded

---

[22]  The Defendant filed a motion to reconsider the Court's decision on the motion for
summary judgment.  (Doc. 41) The Court held a hearing on November 17, 2005.  The Defendant
argued that the demand letter sent by the Plaintiff did not qualify as a demand letter under
Chapter 93A because it was sent to counsel for the Defendant.  In its decision, the Court denied
the motion to reconsider because "[t]he time to raise this argument was when the Plaintiff sought
partial summary judgment that Ameriquest violated M.G.L. c. 93A not in a motion for
reconsideration." (Doc. 45) *See Jorge Rivera Surillo & Co., Inc. v. Falconer Glass Industries,
Inc.*, 37 F.3d 25, 29 (1st Cir. 1994)

-17-

reasonable attorney's fees and costs incurred in connection with said action;
provided, however, that court shall deny recovery of attorney's fees and costs
which are incurred after the rejection of a reasonable written offer of settlement
made withing thirty days of the mailing or delivery of the written demand for
relief required by this section.

The Court found that there had been a violation of section two, therefore the attorney for

the Plaintiff is entitled to reasonable fees and costs.  The Defendant shall have until July 17,

2006 to file any objections to the application of Plaintiff's counsel previously filed.  Upon

review and a hearing, the Court will determine reasonable fees and costs to be awarded under

this count.

### Count Four: Unjust Enrichment

Unjust enrichment is regarded as an equitable claim.  "To satisfy the five elements of

unjust enrichment a plaintiff must show: (1) an enrichment, (2) an impoverishment, (3) a relation

between the enrichment and the impoverishment, (4) the absence of justification and (5) the

absence of remedy provided by law."  *Massachusetts v. Mylan Laboratories*, 357 F.Supp.2d 314,

324 (D. Mass. 2005).  In the instant case, the Court finds that the Defendant was not unjustly

enriched because the Plaintiff has failed to meet her burden of proof.

The Plaintiff alleged in her complaint that the Defendant had incorrectly charged the

Plaintiff $390.00 in late charges as well as charged additional attorneys' fees relating to the

bankruptcy.  The Plaintiff though fails to sustain her burden of proof for the additional late

charges and the attorneys' fees.  There is evidence that the Defendant waived late fees totaling

$376.87 from the Plaintiff's account.  (Pl. Exh. 15, Bates Stamp 000357, Lenstar Notes,

10/29/04, 1:36:31 PM).  According to Lenstar Notes,[23] the Defendant's tracking/tickler system: "AMC will waive all late charges from 11/02 - present."  (Pl. Exh. 15, Bates Stamp 000362, Lenstar Notes, 9/21/2004, 6:15:47 PM).  According to the Detailed Payment History, the late charges totaling $376.87 were waived by the Defendant on November 24, 2004.  (Pl. Exh. 11-9, Bates Stamp 000141)

The Plaintiff also alleged that she was being charged multiple times for the same attorneys' fees.  The burden of proof is on the Plaintiff to prove this allegation.  After reviewing the documents in evidence, the Court finds that the Defendant did not charge the Plaintiff multiple times for pre- or post-petition attorneys' fees.   According Ms. Johnston, several fees may be assessed to a borrower's account.  During Ms. Johnston's deposition, the Plaintiff's counsel focused on four categories: foreclosure fees, foreclosure costs, bankruptcy fees, and bankruptcy costs. Ms. Johnston stated, "Fees are like in the case of an attorney, it would be attorneys' fees in order to process it [foreclosure], and then cost would be something that was a hard cost, like a filing fee, a court filing fee."  (Pl. Exh. 10, Bates Stamp 000078, p. 107, L. 7-11).  She added that mailing costs would also be included in costs.  *Id*.  Amounts included in bankruptcy fees included preparing to file a proof of claim while bankruptcy costs included the fee paid to file a proof of claim or a motion for relief.  (Pl. Exh. 10, Bates Stamp 000078, p. 108, L. 5 - 23).  Ms. Johnston also explained that these fees and costs were passed directly on to the borrower and that there was no markup.

---

[23] The Lenstar Notes system is used to track the progress of an account and keep a record of any activity regarding an account that is in foreclosure or bankruptcy.  It is used by the Defendant and the Defendant's legal counsel to communicate with each other regarding actions that need to be taken, such as filing a motion for relief from stay or filing a proof of claim.  (Pl. Exh. 11-9, Bates Stamp 000077, p. 102, L. 7-9)

The Plaintiff alleged that the Defendant misstated the amount of attorneys' fees listed on the payoff statement provided by the Defendant on September 10, 2004. She alleged that the Defendant had not taken into account attorneys' fees that had been paid by the Plaintiff through a stipulation approved by the Court on July 9, 2003. (Case No. 02-46025, Doc. 49) The stipulation was based upon a Motion for Relief from the Automatic Stay, filed on February 26, 2003, where the Defendant alleged that the Plaintiff had failed to make post-petition payments for December 1, 2003 through February 1, 2003 and had pre-petition arrears of approximately $19,789.14. (Case No. 02-46025, Doc. 29) In June 2003, the parties entered into a stipulation which said that the Plaintiff, over a twelve (12) month period, would pay $97.92 per month totaling $1,175.00 for post-petition legal fees and costs incurred by the Defendant. On December 8, 2003, the Defendant filed a Certificate of Non-Compliance stating that the Plaintiff had failed to remit the payments per the stipulation for August through November, that the July 23, 2003 stipulation payment was short $16.23, and that the August and November post-petition payments were each short $0.66. (Case No. 02-46025, Doc. 68) The Certificate of Non-Compliance was withdrawn on December 10, 2003 when the Plaintiff tendered a payment to the Defendant in the amount $630.25. (Pl. Exh 8) This payment was placed in suspense by the Defendant on December 31, 2003 and not applied to the post-petition attorneys' fees, as agreed upon in the stipulation. (Pl. Exh. 11-9, Bates Stamp 000140)

In the payoff statement generated on September 10, 2004, the Defendant claimed that the Plaintiff owed $12,226.40 for expenses incurred by the Defendant of which $5,790.90 were attributed to bankruptcy costs and fees. (Pl. Exh. 7) Both parties agree that the pre-petition

bankruptcy costs and fees were $2,915.90.  The Detailed Payment History[24] created by Ms.

Johnston shows that on August 23, 2004 the Defendant applied $318.10 from suspense to post-

petition bankruptcy fees.  (Pl. Exh. 11-9, Bates Stamp 000141)    The Court then added up all of

the bankruptcy's fees and costs in the Detailed Payment History and found that the amount listed

on the September 2004 payoff statement was correct.  After exhaustive examination of the

Detailed Payment History, the Court realized that the Defendant did not apply any of the monies

for post-petition attorneys' fees received per the stipulation until August 23, 2004 and October

26, 2004.[25]  The Defendant is not liable for charging the same fees twice, instead the Detailed

Payment History demonstrates poor accounting on the part of the Defendant.

   The Plaintiff also questioned why the foreclosure costs and fees on the Defendant's Proof

of Claim listed these costs as $4161.00 but on the September 2004 payoff statement the costs

were $5256.50.  In response to the Plaintiff's concerns, the Defendant deducted $1095.00, which

coincidentally was the difference between the two amounts, to "non-recoverable."  (Pl. Exh. 15,

Bates Stamp 000357, Lenstar Notes, 10/29/04, 1:36:31 PM) According to the Detailed Payment

History, the amount was shifted to non-recoverable corp. advance on November 24, 2004.  (Pl.

Exh. 11-9, Bates Stamp 000141)

   The Court finds the Plaintiff failed to meet her burden of proof and establish that the

Defendant had been unjustly enriched.  It appears that in regards to the late charges, the

---

[24]  The Detailed Payment History begins with the inception of the loan on November 29,
1997 and runs through April 18, 2005.

[25]  On August 23, 2004, the Defendant applied $318.10 to post-petition bankruptcy fees;
and on October 26, 2004, it applied $856.90 to post-petition bankruptcy fees.  Those amounts
combined equal $1,175.00 which equals the amount agreed upon in the July 2003 stipulation.

Defendant waived those charges in dispute.  In regards to the attorneys' fees, while the

Defendant was not timely in the application of monies to the fees, it did not charge the Plaintiff

multiple times for the same fees.  Generally, the Court would be asked to inquire into the

reasonableness of attorneys' fees assessed by the Defendant; the Plaintiff did not, however,

challenge the reasonableness of the fees.  She merely alleged that the Plaintiff was being unjustly

enriched because the fees were assessed against her account more than once.  The Court does not

have to determine whether the attorneys' fees assessed by the Defendant were reasonable.  Nor is

the Court able to assess whether the fees are reasonable because the Plaintiff did not provide

adequate evidence for the Court to assess the reasonableness of the fees.  The Plaintiff had the

burden of proving each of the elements for unjust enrichment and failed to prove any them.

> The Court finds for the Defendant.

> Count Five: Breach of the Implied Covenant of Good Faith and Fair Dealing

"Under Massachusetts law, every contract contains [an] implied covenant of good faith.

.." *In re Greenberg*, 212 B.R. 422, 429 (Bankr. D. Mass. 1997).  "[N]either party shall do

anything which will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract . . ."  *Druker v. Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385,

348 N.E.2d 763 (1976) quoting *Uproar Co. v. National Broadcasting Co.*, 81 F.2d 373, 377 (1st

Cir. 1936), *cert. denied* 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393 (1936).  "A party may breach

the covenant of good faith and fair dealing implicit in every contract without breaching any

express term of that contract." *Speakman v. Allmerica Financial Life Ins.,* 367 F. Supp.2d 122,

132 (D. Mass. 2005).

> In the instant case, the Defendant breached the implied covenant of good faith and fair

dealing by its inability (or unwillingness) to account for and properly distinguish between pre-petition and post-petition payments made by the Plaintiff, as well as the Defendant's inability to promptly credit the Plaintiff's account from the suspense account.  Its Payment History was little more than a list of numbers showing no credit for payments made.  When asked by the Plaintiff and indeed ultimately ordered by the Court to provide a detailed accounting, the Defendant dragged its feet.  Such behavior is diametrically opposite good faith behavior.

All payments received by the Defendant, whether it was from the Plaintiff or the Chapter 13 Trustee, were being applied to the contractual amount due.  The loan servicing program kept track of the contractual obligations.  The system the Defendant was using has design flaws that inevitably lead to a showing that the Plaintiff behind in her payments.  It did not distinguish between pre- and post-petition obligations which contradicts with 11 U.S.C. § 1322(b) which provides for the curing of any default over the course of the plan, a plan which is binding on the Defendant.   If the amount received did not match the contractual obligation due, the payment was placed into suspense.[26]  The money was then removed from suspense after another payment was received provided together they satisfied the contractual obligation due according to MSP. Once the payment was received, MSP moved the contractual obligation due date forward one month, but this is not what the Defendant always did.  Without explanation, on several occasions the Defendant did not move the contractual obligation due date forward one month, instead it

_____

[26]  At the trial, the Defendant proffered an expert to testify to the general use of suspense accounts by the industry.  The Court did not allow his testimony because it was not specific to the facts of the case nor did the expert have any experience with Chapter 13 cases or Ameriquest's system.  The Court determined under Rule 702 that the alleged specialized knowledge of the Defendant's expert would not assist the Court "to understand the evidence or to determine a fact in issue."  FED.R.EVID. 702.

-23-

held the funds in suspense.

At the same time, an employee within the Defendant's bankruptcy department, a bankruptcy specialist, tracked the Plaintiff's post-petition payments manually. For each payment that complied with the post-petition amount due, the Plaintiff's post-petition obligation due date was manually advanced one month. So while the monies were applied to the contractual obligation, the Plaintiff still received credit for making the post-petition payment. The manual accounting system is of little use to the borrower who receives, as the Plaintiff did, a Payment History showing only that she was in default of her contractual obligation. Ms. Johnston explained this process in her deposition using an example of a post-petition payment made by the Plaintiff:

> Our contractual system, okay, our accounting system, as I said before, there's two separate areas. What we look at and what is normally seen by the rest of the world . If I print out a payment history that's off our system you will not see the post-petition due date. You will see the contractual due date. That's why we have to do them on a manual basis, to show you this what post-petition payment is. And this is what post-petition payments are due for. We say yes, you made your November 1, 2002 payment. It's satisfied in full. Even though I can't credit it, right at that moment, as far as principal, interest, and whatever else might be due out there, it's as if she made that payment. But I can't advance her due date contractually because I don't have enough. But as far as Ameriquest Mortgage is concerned, she's current. (Pl. Exh. 10, Bates Stamp 000085, pp. 133-34)

The Plaintiff asked why there wasn't enough to advance the due date contractually. Ms. Johnston replied, " . . . when the computer is looking at - - when it looks at, 'Okay, you want me to post a payment,' what the computer shows is the payment amount that's due contractually. It doesn't look for what is due post-petition."[27] (Pl. Exh. 10, Bates Stamp 000085, p. 134, L. 16-22)

---

[27] Ms. Johnston's testimony is further supported by Pl. Exh. 11-17, a document created by the Defendant entitled "Payment Applications During Bankruptcy." It states

Additionally, the Defendant was not applying payments deposited into suspense to contractual obligations due promptly.  As explained previously, if the amount paid did not equal the full amount of the oldest outstanding contractual obligation, the payment was placed in suspense. This procedure, though, does not adequately explain instances why funds were being held in suspense despite there being sufficient funds to satisfy at least one if not more contractual obligations.  Examples were illuminated in the Detailed Payment History generated by the Defendant in response to the Plaintiff's document request during discovery.  (Pl. Exh. 11-9)  Ms. Johnston acknowledged that she had not included a running total for monies held in suspense. But even using rudimentary math, it is apparent to the Court that monies were being held in suspense much longer than justifiable.

For instance, as of April 21, 2003 approximately $1,009.39 was being held in suspense. According to the Detailed Payment History, two payments from the Plaintiff in the amounts of $825.37[28] and $820.11 were placed into suspense on April 21, 2003 bringing the new balance in

---

When funds are received for loans in bankruptcy, they may be applied to the loan (principal and interest), suspense, fees and corporate advances.  Funds are applied to contractual payments first.  Any funds exceeding the contractual payments due are generally posted to corporate advances and then to outstanding fees.  Funds received short of the contractual payment due are posted to suspense until sufficient funds are received to post a full contractual payment on the account.

In the event the contractual payment is greater than the post-petition payment amount and the borrower remits the full post-petition payment, the borrower is given credit for the post-petition payment and the post due date is advanced, However, the funds will not be applied to the loan until there are sufficient funds to pay the contractual payment due.

[28]  The check received from the Plaintiff was for $850.00.  The Defendant used $24.63 to pay fees owed, therefore only $825.37 was placed in the suspense account.

suspense to $2,654.87.   At that time, a contractual obligation[29] was due for November 1, 2001 in

the amount of $949.70; no monies were deducted, however, from suspense until May 27, 2003.

Subsequently, the Plaintiff's contractual obligation due date was not advanced until May 27,

2003 despite there being sufficient funds for two contractual payments in suspense.  To

compound the insanity, the Defendant credited the Plaintiff's loan account with two different

payments that it had received on May 27, 2003; thus, reducing the balance in suspense to

$2,558.83 which is also more than enough the satisfy a few more payments.[30]  Unfortunately,

this was not the only example.

From February 3, 2004 through May 4, 2004, the Plaintiff made three payments to the

Defendant, $725.00, $700.77, and $700.00 respectively.  As of May 4, 2004, the Plaintiff's

balance in suspense was approximately $3,299.24.  During that same time period, her contractual

obligations due were $820.96.  For approximately three months, there were sufficient funds

being held in suspense to satisfy two or more contractual obligations, and yet the Defendant did

not apply the monies to the Plaintiff's Note in a timely manner.

In an affidavit submitted to the Court, Ben Vittali[31], Bankruptcy Manager of Ameriquest

---

[29] The Plaintiff has an "adjustable rate" note; therefore her monthly payments are subject to change every six (6) months.   This had an impact upon her monthly payments and helps explain why some of her post-petition payments were placed into the suspense account.

[30] The Plaintiff had sent in two payments: (1) 900.00 and (2) $903.36.  On May 27, 2003, the Defendant withdrew just enough money from suspense to bring each payment to the contractual amount owed at the time, $949.70.  No explanation was offered by the Defendant why it did not employ the same procedure for the payments entered into the suspense account on April 21, 2003 as it did for the payments that came in on May 27, 2003.

[31] Ben Vittali was no longer an employee of the Defendant at the time Ms. Johnston gave her deposition.

-26-

Mortgage Company, stated under oath "Ameriquest Mortgage Company's (AMC) use of

Suspense Accounts is a generally accepted practice throughout the servicing industry." (Pl. Exh.

11-2, Bates Stamp 000110)  At the inception of the promissory note, the Defendant did not

provide the Plaintiff with any information regarding the use of suspense accounts.  In fact, there

is no mention of suspense accounts in any of the Plaintiff's mortgage documents.  If, as alleged

by Mr. Vittali, the common practice in the industry is to use suspense accounts to hold payments

that do not satisfy the contractual obligation due, then the mortgage companies and the

Defendant should disclose their useage in writing in the promissory note and mortgage

documents.

Mr. Vittali further states that "Funds that reside in the 'Suspense Accounts' are applied to

the Debtor's account as required by Paragraph 3 on the mortgage." (Pl. Exh. 11-2, Bates Stamp

000110) Paragraph 3 of the mortgage states "all payments received by Lender under paragraphs

1 and 2 shall be applied:  first, to any prepayment charges due under the Note; second, to

amounts payable under paragraph 2 (funds for taxes and insurance); third, to interest due; fourth,

to principle due; and last to any late charges due under the Note." (Pl. Exh. 1, Bates Stamp

000005)  There is no provision concerning the time of the application of funds; it seems,

however, that as soon as there are sufficient funds in the suspense account to satisfy a contractual

obligation, the funds should be applied.  As demonstrated above, this was not the case.  There

were several payments made by the Plaintiff that were placed in suspense; and despite there

being adequate monies to satisfy outstanding contractual obligations, they were not applied to

these contractual obligations in a timely manner. The Note is also silent regarding the acceptance

and application of partial payments.  Mr. Vittali states in his affidavit that "[t]he 'Suspense

Account' allows lenders to accept short payments that would otherwise be returned to the Debtor

for failing to fully comply with the terms and conditions of the mortgage."  (Pl. Exh. 11-2, Bates

Stamp 000110) Based on the Defendant's policy as explained by Mr. Vittali and Ms. Johnston,

once the Defendant received enough partial payments to satisfy a contractual obligation, those

payments would be applied to the Note.  Again, the Court is not determining whether this is

legally correct, but assuming it is, the Defendant was not following its own policy.

The Court finds that the Defendant has an obligation to properly, and in a timely manner,

credit both pre- and post-petition payments made by the Plaintiff.  Under Chapter 13, a debtor is

permitted to cure a default under a mortgage by paying the pre-petition arrears through the plan

of reorganization and making the ongoing or post-petition payments directly to the servicer.  *See*

11 U.S.C. § 1322.  "The purpose of a Chapter 13 plan is to allow a debtor to pay arrears during

the pendency of the plan while continuing to make payments at the contract rate.  Payments

made during the pendency of the Chapter 13 plan should have been applied by [the lender] to the

current payments [then] due and owing with the arrearage amounts [received from the Chapter

13 trustee] to be applied to the back payments. [The lender] cannot use its accounting procedures

to contravene the terms of a confirmed Chapter 13 plan and the Bankruptcy Code."  *In re Wines*,

239 B.R. 703, 707 (Bankr. D. N.J. 1999) *quoting In re Rathe*, 114 B.R. 253, 257 (Bankr. D.

Idaho 1990).

In the instant case, the Defendant has done just that.  It has used its accounting

procedures to contravene the terms of a confirmed Chapter 13 plan, a plan that was approved on

-28-

January16, 2004[32] and is binding on the Defendant.  (Case No. 02-46025, Doc. 78) According to

Ms. Johnston:

> We don't apply the payments any differently in the case of a Chapter 13
> than we would in any others.  The mortgage spells out how we apply the funds,
> and that's what your asking, and that is listed on the payment history.  It's applied
> to your principal, your interest, it the states the order in which it goes. . . So the
> payments aren't applied any differently.  The only thing that would be there is
> we're tracking the two different due dates.  (Pl. Exh. 10, Bates Stamp 000097, p.
> 182, l. 9-19)

The Defendant is not allowed to rewrite the Bankruptcy Code merely to accommodate the loan

servicing program it chooses to use to maintain accounts.  The Defendant has an obligation to

recognize that the Debtor has made sufficient pre- and post-petition payments.  It has an

obligation to provide a payment history that reflects these payments and not merely shows that

all payments received are being placed in suspense.

In the instant case, the Plaintiff requested a payment history in order to refinance her

Note.  On May 10, 2004, she received the Payment History that showed every payment going

into suspense.  (Pl. Exh. 5) It also showed the contractual obligation due dates, not post-petition

due dates.  (Pl. Exh. 5) It did not demonstrate currency or timeliness of the payments.  Anyone

looking at the Payment History would see payments were received by the Defendant in 2003-04

for contractual obligations due in 2002.  Nothing in the Payment History indicated whether the

payments being received satisfied pre- or post-petition obligations.  The Payment History did not

reflect the alleged manual entries tracking post-petition payments that were made by the

---

[32] The Defendant received notice of the confirmed plan through its counsel.  The
confirmation was sent out on January 16, 2004.  Pursuant to Fed. R. Evid. 201(c), the Court is
taking judicial notice of the Chapter 13 plan that was confirmed.

bankruptcy specialist.  There is nothing on the Payment History that indicates to the Plaintiff or the world whether she was current on pre- or post-petition payments.  The Court finds it to be patently unreasonable and unfair that the Defendant is unable (or unwilling) to account for payments in such a way that the borrower can demonstrate timely payments in order to refinance.

The Defendant also has an obligation to properly apply the payments made by the Chapter 13 trustee under the plan.  According to the confirmed Chapter 13 plan, the Defendant would be paid its pre-petition arrearage in the sum of $18,810.95 over sixty (60) months at the amount of $313.52 per month. (Case No. 02-46025, Doc. 79) The Detailed Payment History shows the first payment of $2,527.20 from the Chapter 13 trustee being credited to the trustee suspense account[33] on June 14, 2004.  (Pl. Exh. 11-9)  On June 16, 2004, the Defendant applied funds held in the trustee suspense account to the two oldest contractual obligations due according to MSP, November 1, 2002 and December 1, 2002 respectively.  The Plaintiff filed bankruptcy on October 2, 2002; and therefore both contractual obligations due that were satisfied by the Chapter 13 trustee's payment were actually post-petition obligations.  This contradicts the purpose of a Chapter 13 plan.  The payments from the Chapter 13 trustee are to be applied to pre-petition contractual obligations, pre-petition arrearages.  In the instant case, this was not happening.

To credit back late charges but be unable to properly bill the borrower or provide an accurate statement on her account or apply payments from the Chapter 13 trustee is

---

[33]  Payments received from the Chapter 13 Trustee were placed in their own suspense account labeled by Ms. Johnston as "trustee suspense."

unconscionable for a large sophisticated national lender. The Defendant has breached the

implied covenant of good faith and fair dealing by inadequately applying, tracking, and crediting

payments made by the Plaintiff.

The Court finds for the Plaintiff on the same issue of liability.

This leaves the Court with the issue of damages. "Claims based on breach of the implied

covenant of good faith and fair dealing sound in contract as opposed to tort." *Jennings v.*

*Nathanson*, 404 F. Supp.2d 380, 399 (D. Mass. 2005). The Plaintiff has the burden of proof on

damages. Punitive damages are not recoverable although the concept is tempting to the Court

considering the Defendant's egregious behavior. The only evidence heard by the Court was that

the Defendant placed all of the Plaintiff's payments into a suspense account, and therefore she

was unable to obtain an acceptable payment history and therefore unable to refinance her

mortgage. As discussed earlier, the Court has insufficient evidence upon which to base an award

for actual damages.

Mental suffering is generally not recoverable in an action sounding in contract; there are,

however, two exceptions to the general rule: (1) when the breach of contract also causes bodily

harm; or (2) if the breach is of such a type that serious emotional disturbance was a particularly

likely result. *Jennings*, 404 F. Supp.2d at 396; *see also* Restatement (Second) of Contracts § 353

(1981). The first exception can be dismissed outright because there is no evidence that the

breach caused bodily harm. The second exception warrants further discussion. The Court heard

testimony from the Plaintiff, her therapist, her psychiatrist, her pastor, and her primary care

physician. Based upon this testimony, it is clear to the Court that the Plaintiff suffered emotional

distress from her interactions with the Defendant. This is supported by the testimony of Dr.

Lundquist.[34]  She said that at an appointment on May 24, 2004, the Plaintiff was feeling much

more depressed than at her previous appointment of April 27, 2004.  An intervening event took

place on May 10, 2004 when the Plaintiff received the twelve-month Payment History from the

Defendant.  It was from that payment history that the Plaintiff first learned that her post-petition

payments were being placed into a suspense account, and therefore did not document a clean

payment history.  The Plaintiff testified:

> I felt like somebody hit me in the stomach and - - and, you know, sucker-punched
> me and . . . - - so when I saw it, . . . it doesn't represent my payments post-
> petition, . . . and to get another mortgage, they need to see that I was making the
> correct payments . . . - - and this doesn't show that.

> I was devastated.  I felt there was no hope, that, you know, unless I agreed to pay
> something that was outrageous. . . I became tremendously depressed and really
> since then I haven't been able to get my feet under me until this Fall (2005).  (Tr.
> Day Two, p. 43, L. 2 - p. 44, L7)

The extreme depression is also consistent with the testimony of Dr. Appell, the Plaintiff's

therapist.  At the Plaintiff's appointment on July 23, 2004, Dr. Appell instructed the Plaintiff's

pastor, Elizabeth Castle, to remove all sharp implements and all medications from the Plaintiff's

home.  Finally, Dr. Casal, the Plaintiff's primary care physician, said that the Plaintiff appeared

very downcast and spoke softly at her appointment on July 28, 2004.

The question for the Court is whether the Defendant's inability to properly apply the

Plaintiff's payments in a timely fashion is such a breach that it was reasonably foreseeable that a

serious emotional disturbance would occur.  The Court is outraged by the egregious behavior of

the Defendant and finds that the breach contributed to the emotional distress of the Plaintiff.  The

Court finds that the Note was "such that emotional distress [was] a reasonably foreseeable

---

[34]  Dr. Lundquist has been the Plaintiff's treating psychiatrist since August 2003.

consequence of its breach." *Jennings*, 404 F. Supp.2d at 397 quoting *Occean v. Marriott Corp*.,

1994 WL 878962 at *5, 1994 Mass.Super. LEXIS 386 at *13 (1994).    The Mortgage

documentation did not disclose to the Plaintiff the usage of suspense accounts.  The Defendant is

a national mortgage company that services thousands of mortgages, and is not unfamiliar with

how payments are made and permitted to be made when mortgagors are in bankruptcy.  The

Defendant had every reason to foresee that a customer would be emotionally distressed when she

discovered that her payments were being held in a suspense account and not applied to her

account timely.  It is not enough that the Plaintiff had a history of depression and therefore, the

Defendant should not be held responsible for her emotional distress.  The Defendant's actions

exacerbated her emotional distress because of its inability to maintain accurate accounts.  "[I]t is

well settled that in an action for damages, the tortfeasor 'takes his victim as he finds him.'"

*Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 275 (1st Cir. 2000) *quoting Doty v. Sewall*,

908 F.2d 1053, 1059 (1st Cir. 1990).

The Court hereby awards $250,000.00 in damages to the Plaintiff for emotional distress

due to the breach of the implied covenant of good faith and fair dealing.

<u>Count Six: Infliction of Emotional Distress</u>

As a threshold matter, the Court must determine whether it has jurisdiction over Count

Six.[35]  Congress defined the scope of bankruptcy jurisdiction in 28 U.S.C. §1334 (2006).  Section

1334 defines "two main categories over which the district court has jurisdiction: 'cases under

---

[35]The Court is disappointed with the parties regarding this count.  Not until proposed
rulings of law were submitted to this Court did either party hint that the Court did not have
jurisdiction to hear Count Six.  The Defendant's proposed rulings of law stated, "The Plaintiff's
claims are non-core matters, pursuant to 28 U.S.C. § 157(b)(2)."  Counsel for the Defendant
failed to raise the issue during a second opportunity at closing arguments.

title 11' over which the district court has original and exclusive jurisdiction, 28 U.S.C. § 1334(a),

and 'proceedings arising under title 11, or arising in or related to cases under title 11,' over

which the district court has original, but not exclusive jurisdiction, 28 U.S.C. § 1334(b)." *New

England Power and Marine, Inc. v. Town of Tyngsborough* (*In re Middlesex Power Equip, &

Marine, Inc.*), 292 F.3d 61, 66 (1st Cir. 2002). "The bankruptcy court has jurisdiction over these

cases through delegation by the district court pursuant to 28 U.S.C. § 157(a) (2000)." *Id*. at 67.

Congress has further delimited the extent to which a bankruptcy court may enter final orders to

those instances where the court has either "core" jurisdiction or, the consent of the parties in a

non-core (i.e. related-to) proceeding. 28 U.S.C. § 157(b) and (c). A case "arising under" title

11, namely the bankruptcy case itself, and those civil proceedings "arising under" or "arising in"

a bankruptcy case come within the bankruptcy court's core jurisdiction. *Concerto Software, Inc.

v. Vitaquest International, Inc.*, 290 B.R. 448, 452 (D. Maine 2003). *See* 28 U.S.C. §

157(b)(1),(2) (2006). Section 157(b)(2) sets forth an illustrative, but by no means exhaustive,

list of core proceedings. Section 157(b)(2)(B) expressly excludes from core jurisdiction "the

liquidation or estimation of contingent or unliquidated personal injury or wrongful death claims

against the estate for purposes of distribution in a case under title 11." Therefore a bankruptcy

court cannot adjudicate personal injury claims pending *against* a debtor for the purpose of fixing

the amount of such claim. Congress, however, further limited the jurisdiction of bankruptcy

courts to adjudicate personal injury claims without specifying that such limitation applies only to

claims against the debtor. Section 157(b)(5) expressly provides:

> The district court shall order that personal injury tort and wrongful death claims
> shall be tried in the district court in which the bankruptcy case is pending, or in
> the district court in the district in which the claim arose, as determined by the

-34-

district court in which the bankruptcy case is pending.

Had Congress intended that the limitation in § 157(b)(5) be only coextensive with that in § 157(b)(2), Congress would have drafted the provision to include language excluding only personal injury claims *against* the debtor.  "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."  *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed2d 290 (1989) (internal quotation marks and citation omitted).  In light of the express language of § 157(b)(5), this Court cannot exercise jurisdiction over the independent cause of action for intentional infliction of emotional distress as the Court finds that such a claim falls within the definition of "personal injury tort.  *In re Cohen*, 107 B.R. 453, 455 (S.D.N.Y. 1989)(personal injury torts include "a cause of action for 'psychiatric impairment beyond mere shame and humiliation.") .

The Court wishes to be clear that it has jurisdiction to award damages for emotional distress where the emotional distress is part of the damages suffered in an action over which the Court has jurisdiction.[36]   In the instant case, however, the Plaintiff pled the infliction of emotional distress as an independent count.  When the infliction of emotional distress stands

---

[36]Bankruptcy courts are allowed to award consequential damages for emotional distress for underlying causes of action.  *See Maxwell v. Fairbanks Capital Corporation* (*In re Maxwell*), 281 B.R. 101 (Bankr. D. Mass. 2002)(violation of any provision of the FDCPA entitles the consumer to an award of actual damages which may include compensation for emotional distress); *Fleet Mortg. Group, Inc. v. Kaneb* (*In re Kaneb*), 196 F.3d 265 (1st Cir. 1999)(emotional distress damages qualify as actual damages under 11 U.S.C. § 362(h)); *In re Barry*, 330 B.R. 28 (Bankr. D. Mass. 2005)(allowed to include damages for emotional distress when a bankruptcy discharge is violated); *Johnstone v. Bank of America, N.A.*, 173, F. Supp. 2d 809, 815 (N.D.Ill. 2001)(allowed  to recover for actual damages for emotional distress caused by violations of RESPA).

alone as a separate and independent cause of action, the Court is without jurisdiction under 28 U.S.C. § 157(b)(5).

Moreover this is not a case where the claim for emotional distress is the gravamen of the complaint that would require that the Court refrain from hearing the proceeding  *See, e.g. In re Thomas*, 211 B.R. 838 (Bankr. D.S.C. 1997 .  Instead the thrust of the complaint is the breach of obligations owed to the Plaintiff by her mortgagee.  Thus while the Court may exercise jurisdiction over those counts in which emotional trauma is an element of damages, it is without jurisdiction to hear the separate count for infliction of emotional distress.

Count Six is hereby dismissed without prejudice.

<u>Count Seven: Lost Income</u>

Count Seven is styled "Lost Income" and seeks compensation for the asserted reduction in the Plaintiff's self-employment income.  Lost income, however, is not a cause of action; it is an element of damages.  As the Court of Appeals for the First Circuit noted in the fee shifting context, "a 'claim' is an allegation of a legal injury comprised of various elements and equivalent to a cause of action, whereas 'damages' are the compensation awarded to the plaintiff who has suffered a legal wrong and who therefore has a valid claim against the defendant." *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 340 (1st Cir. 1997).  Neither the Bankruptcy Code nor Massachusetts law recognizes an independent cause of action for lost income although it can be a factor in calculating the damages awarded to a successful plaintiff. Indeed had the Plaintiff met her burden of establishing the causal connection between the Defendant's actions and her lost income and proved her lost income with some modicum of proof that would have removed the calculation of these damages from the realm of speculation,

the Court would have awarded her such damages under one of the foregoing counts over which the Court has jurisdiction.

Count Seven will be dismissed.

### Conclusion

The Court finds that the Defendant breached the implied covenant of good faith and fair dealing by its inability (or unwillingness) to account for and properly distinguish between pre-petition and post-petition payments made by the Plaintiff, as well as the Defendant's inability to promptly credit the Plaintiff's account from the suspense account. The Court has already found the Defendant liable for violations of RESPA and under Mass. Gen. Law c. 93A.

The Court awards damages to the Plaintiff as follows:

Count Two: $1.00;

Count Three: $25.00; and

Count Five: $250,000.00.

For the reasons stated above, the Court is dismissing Counts One ( Violation of TILA), Four (Unjust Enrichment), Six (Infliction of Emotional Distress), and Seven (Lost Income).

A Separate Order will issue.

Date: June 30, 2006

06/30/2006

Joel B. Rosenthal
United States Bankruptcy Judge

-37-